**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **PACNET SERVICES LTD.,**<br><br> **Plaintiff-in-Interpleader,**<br><br>v.<br><br>**OFFICE OF FOREIGN ASSETS CONTROL of the UNITED STATES DEPARTMENT OF THE TREASURY;**<br>**JOHN DOE DEFENDANTS 1 – 73;**<br><br> **Defendants/Claimants-in-Interpleader.** | Civil Action No.: 1:17-cv-06027 |

<u>**COMPLAINT IN INTERPLEADER**</u>

Pursuant to 28 U.S.C. § 1335(a), Plaintiff PacNet Services Ltd. ("PacNet), by its undersigned attorneys, files this Complaint in Interpleader ("Complaint") against the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") and other named defendants. In support thereof, and to initiate the transfer of funds to the registry of the Court, PacNet alleges the following:

<u>**SUMMARY**</u>

1.      PacNet brings this action pursuant to 28 U.S.C. § 1335(a) for a judicial resolution of competing claims that the defendants have, or may have, in funds that PacNet is holding on behalf of certain clients.

2.      PacNet and its subsidiaries and affiliated companies (together, the "PacNet Group" or "Group") are holding the funds pending formal dissolution of its business due to the designation of the PacNet Group by OFAC initiated last year in coordination with the U.S. Department of Justice ("DOJ") and the U.S. Postal Inspection Service ("USPIS").

3.     On September 22, 2016, OFAC designated the PacNet Group as a significant transnational criminal organization ("TCO"). OFAC made the designation on grounds that the PacNet Group allegedly had engaged in money laundering when it processed payments on behalf of alleged mail-fraud schemes aimed at U.S. residents. As part of the action, OFAC placed the PacNet Group, 12 employees and officers, and related entities on the Specially Designated Nationals and Blocked Persons List ("SDN List"). OFAC purported to act on the basis of the President's Executive Order 13581 issued in July 2011 and the International Emergency Economic Powers Act ("IEEPA," 50 U.S.C. § 1701 *et seq.*).

4.     The immediate impact of the designation included the following:

(i) a block was placed on all property (and interests in property) of all designees subject to U.S. jurisdiction;

(ii) U.S. persons and all persons in the U.S. were prohibited from transacting business with the designees;

(iii) nearly all financial institutions, insurers, and other businesses worldwide, without any connection to the United States or U.S. persons, froze or denied the PacNet Group access to bank accounts, insurance, and property necessary to conduct its business (or, in the case of the individuals, to conduct their ordinary affairs); and

(iv) an immediate and irreparable injury and destruction of the business goodwill and reputations of the PacNet Group of companies and its employees that they built up over more than 20 years of providing professional services for more than 700 clients representing a wide and diverse spectrum of industries and charitable organizations such as manufacturing, transportation, publishing, food, household goods, medical research, religious organizations, and others.

2

5.      Subject to these restrictions, the PacNet Group had little choice but to shutter its doors. The PacNet Group ceased active operations in September 2016, but retained a minimal staff to wind down and dissolve the business to the extent able.

6.      The OFAC designation, however, was ill-considered, incorrect, and contrary to law. PacNet believes that the designation was part of a coordinated government effort by OFAC with the USPIS and DOJ to coerce cooperation by PacNet in a criminal investigation and put it out of business by holding it to answer the public branding and designation as a "criminal" or a "significant TCO." The investigation leading to the OFAC designation was marred by impropriety, incompleteness, and a failure to consider contrary and strongly exculpatory facts readily available to, and in the possession of, the United States Government.

7.      Resolution of an administrative challenge to OFAC action and designation is known for delay, postponement, and the lack of structured, prompt, and impartial review. A congressionally appointed "Judicial Review Commission on Foreign Asset Control," chaired by Larry D. Thompson (who subsequently became the Deputy Attorney General of the United States), long ago highlighted the significant deficiencies of OFAC's administrative reconsideration of designations and made specific recommendations to Congress to establish time frames for reconsideration of designations and to require a "neutral" arbiter review the matter rather than the same persons involved in the initial designation decision and action. Judicial Review Commission on Foreign Asset Control, at 129-134 (January 2001), http://apps.americanbar.org/dch/committee.cfm?com=IC716000 (Amer. Bar Assoc. webpage). Those recommendations have not been acted upon.

8.      In the months that followed the designation, the PacNet Group submitted multiple petitions for review to OFAC that demonstrated plainly and through contemporaneous

3

documentation that the designations of the PacNet Group and 12 individual employees were factually and legally baseless. Following these petitions, OFAC removed all 12 individuals from the SDN List during the period from February 2017 through October 4, 2017. OFAC rescinded the designations of the 12 designated individuals on the following dates:

    a.    February 16, 2017 - Estelle Snyman and Brian Weekes;

    b.    April 6, 2017 - Siobhan Ann Hanrahan and Donna Maria MacBain;

    c.    May 16, 2017 - Rafaella Ferrari;

    d.    June 6, 2017 - Monica Elizabete Bottcher;

    e.    June 21, 2017 - Mary Ann Driscoll;

    f.    August 22, 2017 - Marie Boivan and Ruth Ferlow; and

    g.    October 4, 2017 - Robert Paul Davis, Rosanne Day, and Gerard Humphreys.

9.    In May and June 2017, OFAC informed the PacNet Group that it would only rescind the designations of the PacNet Group and remaining individuals if the PacNet Group submitted funds contractually owed to certain former clients to an interpleader or escrow account where the competing claims of OFAC/the United States Government and the former clients could be contested.

10.    On September 19, 2017, OFAC and PacNet signed a final agreement providing for the removal from the SDN List of the PacNet Group, its subsidiary companies, and the three remaining individuals on the condition that PacNet as a disinterested stakeholder place into an interpleader account funds equivalent to the amounts contractually owed by the PacNet Group to former clients identified by OFAC (the "September 19 Agreement").

11.     Pursuant to the September 19 Agreement, OFAC identified on Friday, October 6, 2017 the funds contractually owed to former clients of the PacNet Group that OFAC specifically represented in writing it had "a reasonable factual basis to believe . . . involve[] the proceeds of fraud or money laundering allegedly committed by a client of the PacNet Group." PacNet agreed to deposit funds in the amount of the contractual debts so identified with the Court's registry and to file a complaint in interpleader to resolve any outstanding debts and liabilities to those clients in furtherance of PacNet's formal dissolution. OFAC identified and selected which client funds owed by the PacNet Group would be subject to an interpleader action. The PacNet Group and its employees, officials, and representatives had no role in the identification and selection of those debts or funds by OFAC on behalf of the United States.

12.     PacNet has no claim to or interest in those funds that are owed to its former clients.

13.     Accordingly, Plaintiff has filed this action to initiate the transfer of contested funds and to bring all actual and potential claimants before this Court so they may have an opportunity to assert their interests in the subject funds (the "Interpleader Fund") and to obtain a judicial determination on their claims. Based on its contractual obligations to its clients, and the prospect that making payment to those clients would conflict with the law or claims of the United States, PacNet reasonably fears the results of competing claims and obligations to the Interpleader Fund. This proceeding is necessary to discharge the PacNet Group's debts and liabilities to all interested parties and to eliminate any risk that the Plaintiff or any companies within the PacNet Group or current or former employees or officers of the PacNet Group will be subject to inconsistent rulings concerning the disposition of the Interpleader Fund or any portion thereof.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over PacNet's statutory interpleader action pursuant to 28 U.S.C. § 1335(a) because:

       a.      PacNet has in its custody or possession funds contractually owed to clients in excess of $500;

       b.      There is diversity of citizenship between two or more Defendants who claim or may claim an interest in the funds; and

       c.      PacNet has filed contemporaneously herewith a motion for leave to deposit the funds into the Court's registry, and will do so immediately upon order of this Court.

15.     To the extent possibly applicable, sovereign immunity has been waived by 5 U.S.C. § 702, 28 U.S.C. § 1335, 28 U.S.C. § 1346, and the action by OFAC, an agency of the United States, to direct PacNet, as a disinterested stakeholder, to file a complaint in interpleader allowing Defendants to contest their competing claims.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1397 because at least one of the Claimants-in-Interpleader resides in the Eastern District of New York. OFAC, as an agency of the United States, has represented that venue is proper in this district and that this Complaint should be filed in this district.

## PARTIES

17.     Plaintiff-in-Interpleader PacNet Services Limited is a limited company formed in Canada and headquartered in Vancouver, British Columbia, Canada. Prior to September 22, 2016, PacNet, for more than 20 years, handled the processing of incoming consumer payments to business clients of PacNet and its affiliated companies and served as a holding company for the PacNet Group's assets.

18.     PacNet is a disinterested stakeholder in this matter. Further facts concerning

PacNet, its status as a disinterested stakeholder, and the PacNet Group are set forth below in the

Factual Allegations section of this Complaint (¶¶ 96-129).

19.     Defendant and Claimant-in-Interpleader OFAC is a United States federal

administrative agency within the United States Department of the Treasury and is located at 1500

Pennsylvania Ave. NW, Treasury Annex, Washington, DC 20220.

20.     Pursuant to the September 19 Agreement, PacNet provided OFAC with a listing

of debt and liability payments owed to its commercial and charitable clients necessary to

conclude its business and formally dissolve. OFAC, with the apparent assistance of other

agencies of the United States Government, reviewed that listing and represented that it has a

reasonable factual basis to believe that certain payments owed to former clients involve the

proceeds of fraud or money laundering allegedly committed by those former clients. Given the

nature of that allegation, PacNet has not publicly named those former clients and their accounts

and instead references them here as Defendants John Doe 1-73 and provides further description

of those Defendants John Doe in a separate submission filed as Annex A under seal with the

Court. The Interpleader Fund is greater than $500 and two or more of the Defendants John Doe

and Defendant OFAC are diverse in citizenship.

21.     All of the Defendants/Claimants-in-Interpleader John Doe 1-73 have claims to the

Interpleader Fund that are adverse to the claims of the Defendant/Claimant-in-Interpleader

OFAC.

22.     The factual allegations presented in the following section of this Complaint

further support the finding that PacNet is a disinterested stakeholder in this matter.

## FACTUAL ALLEGATIONS

**I.    The PacNet Group's Business Operations, Services, and Clients**

23.    From its inception in 1994 to September 22, 2016, the PacNet Group operated a leading international payment processing business with headquarters in Vancouver, British Columbia – in the heart of the business district. The PacNet Group offered merchants around the world payment solutions involving credit card, electronic payment, direct debit, and check processing services. The PacNet Group also offered multi-currency payout services such as refunds, rebates, and commission payments.

24.    PacNet was audited regularly and frequently by the Canadian government, financial institutions, and independent auditors/accountants. PacNet employed professional compliance staff and well-respected outside auditors.

25.    The PacNet Group's corporate structure was necessitated by its global operations on behalf of its business clients. In general, the PacNet Group's business model revolved around three primary entities: (i) PacNet, which handled the processing of incoming payments to its for-profit and charitable business clients; (ii) Chexx, which submitted consumer rebates, commission payments, refunds and other consumer payments on behalf of its for-profit and charitable business clients; and (iii) Counting House Services Ltd., which mainly served regulated markets outside North America, principally outgoing payments, and did not provide consumer check processing for business clients. A company related by common ownership, Accu-Rate Corporation, handled foreign exchange transactions in the capital city of Ottawa, Canada, for a variety of corporate and individual consumer customers, including diplomatic officers, offices, and embassies located in Ottawa.

26.     As noted above, Counting House, Chexx and Accu-Rate were not involved in the business of inbound check processing. For example, Chexx's principal client base consisted of market research companies that conduct worldwide market research surveys. Participants in the surveys earn a small reward, and responsibility for the payment of that reward was outsourced to Chexx pursuant to its arrangements with the market research companies for which it acted. Some of Chexx's clients included Comscore, AC Nielsen, and Decision Analyst, which conduct surveys for companies such as American Airlines and Proctor & Gamble.

27.     The PacNet Group established various foreign entities outside Canada and Ireland as required for its diverse, lawful operation in those foreign jurisdictions. The PacNet Group formed other entities for tax, accounting, and licensing purposes.

28.     Before it ceased operations, the PacNet Group employed approximately 125 individuals, nearly all of whom were employed in Canada, Ireland, and the United Kingdom.

29.     The PacNet Group provided payment processing services for a number of businesses throughout the world. It boasted a client roster of more than 700 clients, including well-respected companies and organizations such as Bloomberg Business Weak, MasterCard Payment Gateway Services Client Finance, the Catholic Archdiocese of Durban, Dementia Research UK, Animals Asia Foundation Limited, Special Olympics British Columbia Society, and iATS Payments LLC (through which PacNet processed payments for dozens of charities and community institutions). PacNet clients received thousands of checks per day that required processing and eventual deposit into their accounts. Payment processing company clients trusted and relied upon PacNet to receive, process, and distribute accurately and efficiently the proceeds of those thousands of checks daily. A minority of PacNet's business pertained to merchants that distributed direct-mail promotions involving sweepstakes reports or astrological information.

None of the public filings or statements by the U.S. Government or the OFAC "administrative record" relied upon in connection with the designation of the PacNet Group as an alleged "significant TCO" referenced the scope or nature of the vast bulk of PacNet's business and clients that were highly respected, legitimate businesses or the fact that the higher risk direct mail clients targeted by the U.S. Government accounted for a small portion of PacNet's total revenues.

## II.     The PacNet Group Operations Were Legal

30.     Acting on the basis of emergency authorities granted by Congress to the President in IEEPA to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States, OFAC designated the PacNet Group as a "significant TCO" based on its finding that the PacNet Group constituted a "significant TCO" and presented an unusual and extraordinary "threat to the U.S. economy."[1] OFAC found that PacNet presented an unusual and extraordinary threat to the national economy because of the alleged consumer frauds perpetrated by some of its customers and its alleged concealment of those actors from law enforcement agencies, regulators, and financial institutions. OFAC explained the basis for its finding as follows:

> The PacNet Group's international corporate and financial infrastructure allows it to launder and move money while obscuring the beneficial ownership of funds belonging to PacNet Group clients from international and domestic law enforcement agencies and regulators, as well as form the due diligence of formal financial institutions. OFAC assesses the PacNet Group's critical role as a facilitator engaged in money laundering on behalf of a variety of illicit actors poses a threat to the U.S. economy. As a result of how the PacNet Group is organized, and how it conducts itself, OFAC assesses that it poses a unique challenge to timely coordinate acted by individual domestic and foreign law

---

[1] OFAC's findings and conclusions are set forth in an "Administrative Record."  PacNet was provided only a limited, redacted version of the Administrative Record that purportedly supported the designations. The Administrative Record relied heavily on a vague and incomplete report from the USPIS.

enforcement authorities and represents the type of well-organized globally districted target the introduction of Executive Order 13581 [regarding significant TCOs] was intended to address.

31.     OFAC's finding that the PacNet Group constituted a significant TCO and its reasoning in support of that finding are directly and undeniably contradicted by the historical facts and contemporaneous, documentary records concerning the business of the PacNet Group, including facts and records that were in the possession of the United States Government or readily available to the United States Government at the time of the September 2016 designations by OFAC.

32.     At all times relevant to OFAC's enforcement action, the PacNet entities were registered with the appropriate regulators, including the Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC"), the U.S. Financial Crimes Enforcement Network ("FinCEN"), the U.K. Financial Conduct Authority ("FCA") and other governmental agencies.

33.     The PacNet Group established and implemented compliance programs, submitted to routine audits by regulators and financial institutions, and complied with its tax and reporting obligations.

        a.      Compliance Programs. The PacNet Group maintained a dedicated compliance department led and staffed by trained professionals. The PacNet Group through its compliance department established an anti-money laundering ("AML") and anti-terrorist financing ("ATF") compliance program that was regularly inspected and audited by FINTRAC, Deloitte Canada, MasterCard, and other AML/ATF experts.

                i.      As part of that program, the PacNet Group submitted to FINTRAC hundreds of Suspicious Transaction Reports ("STRs") and Large Cash Transaction Reports

11

("LCTRs")[2] as required under Canadian law. In some cases, for instance, the reports filed by the PacNet Group with the Canadian Government and FINTRAC in 2015 and 2016 before the OFAC designation identified individuals and companies that OFAC alleged that the PacNet Group had concealed and "obscured" from law enforcement and regulatory agencies. The PacNet Group filed hundreds of such reports before September 2016 and its designation. None of those reports were apparently examined by OFAC before designating the PacNet Group as a significant TCO based on its alleged subterfuge of the identity of the direct mail companies that were disclosed in those reports filed with the Canadian government and the U.S. Treasury Department's counterpart. Likewise, OFAC and the U.S. Government referenced none of those efforts in public filings or statements made in announcing, at a nationally-broadcast press conference, the designation of the PacNet Group and the 12 individuals.

ii.     The PacNet Group established other compliance measures as well. For example, in or about 2009, the PacNet group implemented the "multi-buyer" measure, which screened for and rejected excessive payments that were: (i) drawn on a single bank account (ii) within a set period of time (iii) in connection with any combination of the PacNet Group's clients. As a result of such measures, the PacNet Group refused to process thousands of transactions worth millions of dollars.

iii.     PacNet required direct mail clients to furnish copies of the promotions for which PacNet would process payments. PacNet often further required clients to furnish legal opinions concerning the legality of the promotions submitted to PacNet. PacNet had a reputation in the direct mail industry for an honest and effective due diligence process. In fact,

---

[2] Canada's requirement for STRs and LCTRs is analogous to the U.S. requirement for Suspicious Activity Reports ("SARs") and Currency Transaction Reports ("CTRs").

as described below, the United States Government relied upon that effective process and PacNet's good reputation in the community as evidence in the prosecution of a direct mail conspiracy based on the conspirators' deception of PacNet and efforts to defeat that due diligence process.

      b.    <u>Inspections and Audits.</u> The PacNet Group's internal records and financial accounts were subject to routine inspection and audit by FINTRAC and other regulators, banks, and independent AML/ATF experts and Chartered Professional Accountants. The PacNet Group also conducted regular sanctions/designations/PEP screening of all clients through highly respected third-party vendors to screen and review its clients for any suspected of, or sanctioned for, unlawful activity.

      i.    On multiple occasions, FINTRAC compliance officers visited the PacNet Group's offices, conducted compliance examinations, and issued findings for improvement by the PacNet Group that the PacNet Group acted upon and FINTRAC reviewed.

      ii.    Similarly, the PacNet Group engaged Deloitte Canada Forensic & Investigative Services Inc. to conduct AML/ATF compliance reviews.

      iii.    Banks and other financial institutions conducted on-site reviews of the PacNet Group's operations and records. For example, in 2015, the Global Risk Management Program ("GRMP") of MasterCard conducted a global risk management review to assess the PacNet Group's readiness to handle risks in its acquiring portfolio and to evaluate the Group's fraud-control measures and adherence to MasterCard's rules and regulations. Based on that review, the team-lead noted that PacNet was committed to "processing in a safe, risk sensitive manner and meeting MasterCard Standards[.]"

c.     Reporting. Not only did the PacNet Group subject itself to periodic inspections and audits, the Group also complied with ongoing reporting obligations to regulators and financial institutions.

i.     As stated above, the PacNet Group submitted to FINTRAC hundreds of Suspicious Transactions Reports ("STRs") and Large Cash Transaction Reports ("LCTRs") before OFAC's September 2016 designations and resulting closure of the PacNet Group.  As publicly reported by the U.S. Department of Treasury, highly respected financial institutions file annually more than a million suspicious activity reports about transactions involving their own clients. Likewise, the PacNet group filed STRs and LCTRs which identified certain former clients and direct mail businesses. Yet, OFAC accused the PacNet Group of "obscuring" the activities and operators of those same former clients and direct mail businesses from law enforcement and regulatory agencies to such a degree that the PacNet Group presented an unusual and extraordinary threat to the national economy of the United States warranting a designation as a significant transnational criminal organization "such as" Los Zetas and the Camorra/Italian mafia. To date, neither OFAC nor any other governmental agency has contacted the PacNet Group regarding those STR and LCTR filings.

ii.     Moreover, the PacNet Group was entirely transparent with its bankers including numerous major financial institutions which themselves had legitimate, good faith compliance and due diligence programs. The PacNet Group regularly furnished those financial institutions with information about its business operations including lists of all of its clients. These lists included the portion of its business involving the processing of payments received by direct mail businesses that sold astrology information and sweepstakes reports.

14

iii.     Furthermore, the PacNet Group was regularly audited by the British Columbia Ministry of Finance as part of its annual tax reports and submissions. The audits and annual submissions included disclosure of PacNet's clients to the Canadian government.

34.     As a result of its policies and practices, the PacNet Group was well-known and respected within the payment processing community and direct-mail industry. The PacNet Group's reputation for compliance was so well-known that some clients actively misled the PacNet Group so it would not close their accounts for fraudulent activity. This fact was highlighted in a recent federal mail fraud prosecution, *United States v. Pisoni*, No. 1:15-cr-20339-DPG (S.D. Fla. filed May 7, 2015). In that matter, the United States Government, through its Justice Department, represented to a federal judge and relied upon facts that PacNet's compliance and due diligence program was so well-known to direct mailers that they needed to conceal the true nature of their mailings from PacNet.

a.     In May 2015, John Leon and three co-defendants were indicted in the U.S. District Court for the Southern District of Florida on charges of money laundering and mail fraud.[3] Mr. Leon cooperated with authorities and ultimately entered a guilty plea in June 2016.[4]

b.     In February 2016, Mr. Leon met with two Assistant U.S. Attorneys and agents for the USPIS and IRS.  According to the Treasury Department and USPIS agents' interview report dated February 17, 2016, Mr. Leon told the agents that his organization provided certain respected payment processors and third-party companies, such as PacNet and

---

[3] Indictment, *United States v. Pisoni*, No. 1:15-cr-20339-DPG (S.D. Fla. filed May 7, 2015), ECF No. 3.

[4] *See* Plea Agreement, *Pisoni*, No. 1:15-cr-20339-DPG (S.D. Fla. Filed June 3, 2016), ECF No. 155.

American Express, "clean promotions" or sanitized versions of fraudulent direct-mail pieces. According to the interview report of the Treasury Department and USPIS agents, Mr. Leon stated that the direct mailers did so to conceal the true nature of the direct-mail scheme. According to Mr. Leon, PacNet was one company "that received clean promotions."

   c. In his plea agreement executed that day (*i.e.*, on February 17, 2016), Mr. Leon stated that he "contracted with a payment processing company, from whom [he] hid the fraudulent nature of the scheme."  Mr. Leon contracted PacNet.

   d. Similarly, according to an interview report dated March 11, 2016 by USPIS and Treasury Department agents, Mr. Leon told the investigators that his direct mail organization provided "clean promotions" to PacNet because of PacNet's reputation for honesty and refusal to process payments received as a result of fraudulent promotions or transactions.

   e. Finally, in connection with Mr. Leon's June 2016 criminal guilty plea, Mr. Leon and the United States agreed and represented to the federal court that Mr. Leon had intentionally withheld the fraudulent nature of the mail fraud scheme from PacNet:

> From early 2008 to mid-2014, in Miami-Dade and Broward Counties, in the Southern District of Florida, MATTHEW PISONI, MARCUS PRADEL, JOHN LEON, VICTOR RAMIREZ and others conspired to defraud individuals by sending mail that falsely and fraudulently promised victims that the victims won a sweepstake but needed to pay a fee between $20 and $50 to receive a guaranteed award. . . .JOHN LEON'S role in the scheme included generating the false and fraudulent content of the mailers. Specifically, LEON discussed with his conspirators generating a 'higher response rate' by modifying the 'variables' on the fraudulent prize letters, for example, by changing the amount of time a victim had to respond to the award or by changing the amount of the purported sweepstakes amount. . . . **Furthermore, LEON contracted with a payment processing company, from whom LEON hid the fraudulent nature of the scheme**.[5]

---

[5] February 17, 2016 Plea Agreement and Proffer of Fact between John Leon and the United States in *United States v. Pisoni*, 15-CR-20339 (S.D. Fla. June 3, 2016) (D.E. 155) at 12-13 (emphasis added).

Thus, the U.S. Government relied on the same PacNet compliance and due diligence program that OFAC ignored in connection with its TCO designations as substantive evidence of Mr. Leon and his co-conspirators' criminal intent.

35.     Notably, the PacNet Group implemented the above-described compliance regime, even when doing so cost the business significant revenue:

        a.     In June 2016, the PacNet Group terminated direct mailer BDK Mailing GmbH after questions arose concerning BDK's mailing of noncompliant promotions, which had not been submitted to the PacNet Group for review. After learning of the promotions, the PacNet Group concluded it could no longer do business with BDK and terminated the account with one day's notice. On September 22, 2016—the same day that OFAC designated the PacNet Group as a significant TCO—the U.S. Government announced it was suing BDK and its codefendants due to their alleged mail fraud.[6]

36.     In August 2016, nearly a month before OFAC's designations and *without notification or knowledge* of those impending designations, the PacNet Group determined to discontinue processing payments on behalf of clients in the direct mail industry involving sales of certain astrology and sweepstakes reports promotions due to the PacNet Group's internal compliance concerns.

        a.     On August 31, 2016, the PacNet Group sent a written notification to its clients that sold astrology and sweepstakes newsletters/reports direct mail promotions notifying

---

[6] *See* Compl., *United States v. BDK Mailing GmbH*, No. 16-cv-5264 (E.D.N.Y. filed Sept. 22, 2016), ECF No. 1.

them of its decision to stop accepting new business and to wind-down the processing of payments by October 31.

b.      That decision reflected PacNet's voluntary action to exit a lawful, but high-risk, market. That decision plainly was taken without any knowledge of OFAC's then apparently pending consideration to designate the PacNet Group and 12 of its employees as an international criminal organization.

c.      As demonstrated in contemporaneous internal communications in August 2016, and external communications on August 31 and in early September 2016 with disappointed clients, the PacNet Group acted sincerely and affirmatively to end its processing of payments arising from direct mail business involving sales of certain astrology and sweepstakes newsletter/report promotions.

37.      Prior to September 22, 2016, neither PacNet nor its affiliates, directors, or officers had ever been accused—much less charged and convicted—of any criminal offense arising from its business activities. To the contrary, as recently as June 2015, a prosecutor with the Justice Department's Consumer Protection Branch assured counsel for PacNet that it was not a target of DOJ's mail-fraud investigation, which resulted in the civil and criminal actions announced in September 2016. In fact, that prosecutor stated in an e-mail dated May 26, 2015 that he "appreciate[d] PacNet's cooperation with [the] investigation and [] willingness to voluntarily produce records."

### III.   OFAC's Inappropriate TCO Designation of the PacNet Group

38.     Despite PacNet's compliance regime, disclosure of its business clients and activities to regulatory agencies, major financial institutions, and independent auditors, lack of criminal history, and readiness to assist the DOJ's investigation, OFAC on September 22, 2016 designated the PacNet Group as a significant transnational criminal organization without notice or warning and listed the PacNet Group, approximately 30 subsidiary entities, and 12 employees and officers on the SDN List. OFAC made the designations in connection and coordination with a mail-fraud investigation undertaken by the DOJ and USPIS.

39.     As a result of OFAC's action, a block was placed on all property and interests in property belonging to the PacNet Group, and all "U.S. Persons" were prohibited from doing business with the PacNet Group. Although not compelled as a matter of foreign law, financial institutions, insurance companies, internet service providers, and numerous other types of businesses located outside the United States cancelled long standing contractual relationships with the PacNet Group and designated individuals. OFAC's designations effectively forced the company out of business; the PacNet Group ceased active operations in September 2016.[7]

40.     OFAC's designations were extraordinary and based on incomplete and false information for multiple reasons, including the following among others. OFAC made the designations without providing the PacNet Group or the related individuals and entities any advance notice or warning. Thus, the designees had no opportunity to defend against the allegations or to proffer mitigating evidence to limit the designations or the company's

---

[7] The September 2016 designations against the PacNet Group of companies remain in effect and continue to prevent the PacNet Group from having access to its financial accounts and records that is necessary to make final determination of the exact amounts due and owing to all former clients.

immediate demise. As a result, OFAC made its designations with incomplete and inaccurate information about the company, its history, business practices, and compliance programs, and without readily available documents and information held by the Canadian and United States Governments, financial institutions, outside independent auditors, and others.[8]

41.    The designations were and remain remarkable because the businesses comprising the PacNet Group were legitimate, highly regulated and audited businesses which were branded a significant international criminal organization, despite the absence criminal indictment and conviction, based on alleged fraud that, at most, tainted a fraction of the PacNet Group's global business. Finally, the OFAC September 2016 designations of the PacNet Group were remarkable because, as reflected in its own administrative record, OFAC ignored the President's definition of a significant TCO as set forth in the July 2011 Executive Order.

42.    OFAC's authority designate an entity as a "significant TCO" is based on the President's July 2011 Executive Order 13581, which the President issued pursuant to authority granted by Congress in the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("IEEPA"). In IEEPA, Congress provided the President with extraordinary authority to deal with national emergencies by, among other actions, blocking any property of a foreign country or foreign national and prohibiting any dealing in such property. 50 U.S.C. § 1702(a). IEEPA authorizes the President to exercise such national emergency authority only "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

---

[8] As OFAC learned of the facts alleged herein, it agreed to remove the PacNet Group and related individuals and entities from the SDN List, provided certain requirements are met.

43.     Pursuant to IEEPA, President Obama, in July 2011, issued Executive Order 13581– "Blocking Property of Transnational Criminal Organizations," finding specifically that the activities of certain significant transnational criminal organizations "**such as**" Los Zetas (violent Mexican/Central American drug cartel), the Camorra (Italian mafia), the Yakuza (Japanese mafia), and the Brothers' Circle (Eurasian mafia) "have reached such scope and gravity that they threaten the stability of international political and economic systems." [9] The President further found that such significant TCOs "facilitate and aggravate violent civil conflicts and increasingly facilitate the activities of other dangerous person."  Based on those findings, the President "determine[d] that significant transnational criminal organizations constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" sufficient to "declare a national emergency to deal with that threat."  E.O. 13581.

44.     Section 1(a) of Executive Order 13581 expressly requires the blocking of all property and interests of property of persons subject to U.S. jurisdiction who are designated as significant TCOs.[10] The Executive Order also prohibits all United States persons and persons in the United States from transacting business with persons designated as significant TCOs.[11]

45.     The President in Section 3(e) of Executive Order 13581 carefully and specifically defined the term "significant transnational criminal organization" to mean the following:

> a group of persons, **such as those listed in the Annex** to this order, that includes one or more foreign persons; that engages in an ongoing pattern of serious criminal activity involving the jurisdictions of at least two foreign states; and that threatens the national security, foreign policy, or economy of the United States.[12]

---

[9] Exec. Order No. 13,581, *reprinted in* 76 Fed. Reg. 44,757 (July 24, 2011) (emphasis added).

[10] *Id.* at § 1(a), 76 Fed. Reg. at 44,757.

[11] *Id.* at § 1(a), (c), 76 Fed. Reg. at 44,757–58.

[12] E.O. 13581 (emphasis added).

21

In turn, the Annex to Executive Order 13581 listed four organizations that were to serve as the specified kind of transnational criminal organization that were the cause of the national emergency and, thus, were to be the target of any future designation under the authorities of IEEPA as a significant transnational criminal organization. As noted above, those four significant transnational criminal organizations are:  Los Zetas (Mexican/Central American drug cartel), the Yakuza (Japanese mafia), the Brothers' Circle (Eurasian mafia), and the Camorra (Italian mafia).[13]  All four of those crime syndicates have, through repeated acts of violence, coercion, and public corruption, gained influence and control in various aspects of civil society and civil governments, according to publicly issued criminal complaints, indictments, and charging documents.

46.    The President's finding of a national emergency in relation to significant TCOs was issued in conjunction with the White House/National Security Council's issuance of the "Strategy to Combat Transnational Organized Crime:  Addressing Converging Threats to National Security." That National Security Strategy further defined and characterized transnational criminal organizations to include the following characteristics:

- "In at least part of their activities they commit violence or other acts which are likely to intimidate, or make actual or implicit threats to do so.
- They exploit differences between countries to further their objectives, enriching their organization, expanding its power, and/or avoiding detection/apprehension.
- They attempt to gain influence in government, politics, and commerce through corrupt as well as legitimate means.
- They have economic gain as their primary goal, not only from patently illegal activities but also from investment in legitimate businesses; and

---

[13] *Id.* Annex, 76 Fed. Reg. at 44,759.

- They attempt to insulate their leadership and membership from detection, sanction, and/or prosecution through their organizational structure."[14]

47.      Congress directed that IEEPA authority "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and **may not be exercised for any other purpose**."[15] Congress also limited the Executive Branch to use a declaration of a national emergency to deal with only one unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and not to expand application to other circumstances:  "Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat."[16]

48.      In short, OFAC may not use one national emergency to justify the blocking of a foreign national's property simply because OFAC believes that the foreign national presents an unusual and extraordinary threat to the national security, foreign policy, or the economy unless that threat falls squarely and precisely within the scope of a previously proclaimed and defined national emergency and thereby within OFAC's authorization under IEEPA to act.  With respect to the four international criminal organizations noted above which the President used to define the scope and meaning of a "significant TCO" which could be designated pursuant to the President's July 2011 declaration of a national emergency and Executive Order, all were designated as a significant TCO after numerous members and leaders of the organizations had been indicted, charged, and convicted of serious criminal offenses in the U.S. or abroad and had

---

[14] NSC, Strategy to Combat Transnational Organized Crime: Definition, https://obamawhitehouse.archives.gov/administration/eop/nsc/transnational-crime/definition.

[15] 50 U.S.C. 1701(b) (emphasis added).

[16] 50 U.S.C. § 1701(b).

corrupted civil society and civil governments through corruption, coercion, and violence.  None
of the organizations was a legitimate business unwittingly defrauded by its clients' mail fraud.

49.    A sea change occurred on September 22, 2016, when OFAC designated the
PacNet Group as a significant TCO for allegedly "facilitat[ing] the fraudulent activities of its
customers" by processing payments on behalf of "perpetrators of . . . mail fraud schemes."[17]
Before then, TCO designations had been reserved for drug cartels, organized crime syndicates,
terrorist financiers, and other violent criminal enterprises in accordance with federal law, i.e., the
President's definition of a "significant transnational criminal organization" in the July 2011
Executive Order. PacNet was nothing of the sort.

50.    PacNet operated publicly, professionally, and in a highly regulated and audited
industry for more than twenty years from the same business offices and location in Vancouver,
British Columbia. Neither the PacNet Group nor its affiliates, directors, or officers had ever been
charged with or convicted of any crime. Moreover, in contrast to all other designated TCOs, the
PacNet Group had established itself as a global leader of the payment-processing and money-
services industry with more than 700 clients, including Bloomberg Business Week, MasterCard
Payment Gateway Services Client Finance, the Catholic Archdiocese of Durban, and numerous
non-profit groups. The PacNet Group could not operate outside of the legal, regulated financial
system.

51.    In connection with the September 22, 2016 Designation of the PacNet Group,
OFAC and the U.S. Government failed to consider or mention that:

---

[17] Press Release, Treasury Sanctions Individuals and Entities as Members of the Pacnet Group
(Sept. 22, 2016), https://www.treasury.gov/press-center/press-releases/Pages/jl5055.aspx (last
visited Sept. 24, 2017).

        a.      the PacNet Group had regularly and consistently filed Suspicious Transaction Reports and Large Cash Transaction Reports with Canadian law enforcement and regulatory officials with details on its clients and their transactions;

        b.      the PacNet Group had disclosed and discussed its entire client list through the years with a number of major financial institutions in connection with those financial institutions' review and due diligence of PacNet and its business operations and clients;

        c.      the PacNet Group had been regularly subject to full, unrestricted access, review, and audit by FINTRAC, a number of major financial institutions, and outside auditors;

        d.      the DOJ in June 2016 presented facts, under oath, to a federal judge in the United States District Court for the Southern District of Florida that as a result of the reputation and fact of the legitimate and good faith compliance and due diligence programs of the PacNet Group, dishonest direct mailers were required to trick PacNet and to conceal their actual activities from PacNet in order to retain and maintain PacNet's services as a payment processing company;

        e.      the PacNet Group in August 2016 had notified in writing its clients that it was discontinuing and exiting payment processing for astrology and sweepstakes reports businesses – a determination and notification made by the PacNet Group prior to, and without knowledge or warning of, the impending September 22, 2016 designations;

        f.      that none of the PacNet Group companies or any of its officers, directors, or employees had been charged with a criminal offense; and

        g.      that at least one USPIS agent in the months leading up to the designations had shared the U.S. Government's incomplete and unreviewed investigative findings and information with CNN Reporters bent on sensational headlines and articles, which articles

OFAC then relied upon in designating the PacNet Group pursuant to the national security authorities of granted by Congress to deal with national emergencies.

52.     As an immediate result of OFAC's action, nearly all of the PacNet Group's assets and accounts were frozen, its reputation was shattered, and its business ceased. The PacNet Group was forced to shutter its doors, and maintained a minimal staff to respond to OFAC's designation and to wind down and formally close the business.

53.     With the above information and additional facts which that had not been brought to OFAC's attention by the USPIS which apparently advocated for the designations, OFAC determined to rescind the designations and in fact has acted to rescind the designations of all 12 individuals and has agreed to do so for all the corporate entities that were put out of business effectively upon designation in September 2016.

### Adverse Claims

54.     In May and June 2017, as part of discussions for the delisting of the PacNet Group, OFAC demanded that PacNet set aside funds that PacNet contractually owed to certain former clients to allow OFAC or the United States to make a claim upon those funds based on the allegedly fraudulent conduct of those former clients. OFAC made that demand and claim a condition of rescission of the remaining designations against the PacNet Group.

55.     On or about September 19, 2017, PacNet executed an agreement with OFAC for the rescission of the OFAC's designations of the remaining individuals and entities subject to certain terms and conditions. On that same date, PacNet provided OFAC with a listing of outstanding debts and liabilities to former clients. Pursuant to the September 19 Agreement, OFAC then examined that listing of debts and liabilities for the next 17 days with the apparent assistance of other agencies and departments of the United States Government.

56.     On October 6, 2017, OFAC represented in writing to PacNet that it had identified a reasonable factual basis to believe that certain of the debts and liabilities owed to former clients, which OFAC identified, involve the proceeds of fraud or money laundering allegedly committed by those clients. At that same time, OFAC asserted a claim over those amounts and directed and authorized, by means of a license issued under the authority of IEEPA, that PacNet transfer the total amount owed to one or more interpleader accounts of the United States District Court for the Eastern District of New York.

57.     Upon information and belief, the total amount claimed or that may be claimed by Defendants/Claimants in Interpleader and defendant OFAC is an approximate value of $5,220,855.08 USD, which represents the total amount in the Interpleader Fund.

58.     Upon information and belief, each named Defendant other than OFAC had a positive account balance with the PacNet Group as of the date of this filing that has not been paid to the client or the client's agents, representatives, or beneficiaries as of the date of this filing.

59.     The claims and potential claims that could be asserted by the Defendants are adverse to each other because the cumulative amounts that Defendants have asserted or may assert exceed the value of the Interpleader Fund. Because the cumulative value of actual and potential claims exceeds the available sum, the claims are adverse to each other: each Defendant has an interest in defeating or reducing the amount asserted by other Defendants.

60.     As a disinterested stakeholder in the Interpleader Fund, the PacNet Group has no interest as to how competing claims are resolved or the funds are disbursed. PacNet has commenced the instant action so that the Interpleader Fund may be paid as ordered by this Court.

61.     Accordingly, PacNet has filed a motion herewith requesting leave to deposit into the Court's registry the entirety of the Interpleader Fund.

**Prayer for Relief**

WHEREFORE, PacNet prays that the Court enter judgment:

(a) giving the Plaintiff leave to deposit the amount of the Interpleader Fund into the Court's registry, or as this Court otherwise directs, to be paid out as this Court shall direct;

(b) requiring the Defendants to answer this Complaint and litigate their claims between themselves for the Interpleader Fund or any portion thereof;

(c) releasing and discharging the Plaintiff, the PacNet Group, their employees, officers, directors, and agents against any and all liability arising from the Interpleader Fund at issue;

(d) permanently restraining and enjoining the Defendants from instituting and/or prosecuting any other lawsuit or proceeding in any state or United States court affecting or in connection with the Interpleader Fund;

(e) dismissing the Plaintiff from the action with prejudice and discharging and absolving the Plaintiff, the PacNet Group, their employees, officers, directors and agents from any and all further liability to Defendants relating in any manner to the Interpleader Fund upon payment of the Interpleader Fund into the Court's registry or as otherwise directed by the Court; and

(f) awarding PacNet any other relief, fees, and costs the Court deems just and proper.

Dated: October 16, 2017

*/s/ Jeff Ifrah*
A. Jeff Ifrah
E-mail: jeff@ifrahlaw.com
George R. Calhoun (Pro Hac Pending)
E-mail: george@ifrahlaw.com
IFRAH LAW

28

1717 Pennsylvania Ave., NW, Suite 650,
Washington, D.C. 20006
Telephone: (202) 524-4142

Steven W. Pelak (Pro Hac Pending)
E-mail: SWPelak@hollandhart.com
Michael J. O'Leary
E-mail: MJOleary@hollandhart.com
HOLLAND & HART LLP
975 F Street NW, Suite 900
Washington, D.C. 20004
Telephone: (202) 654-6500

***Attorneys for Plaintiff-in-Interpleader***