IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **PACNET SERVICES LTD.,**<br><br>    Plaintiff-in-Interpleader,<br><br>v.<br><br>**OFFICE OF FOREIGN ASSETS CONTROL of the UNITED STATES DEPARTMENT OF THE TREASURY;**<br>**JOHN DOE DEFENDANTS 1 – 73;**<br><br>    Defendants/Claimants-in-Interpleader. | Civil Action No.:  17-cv-06027 |

**PACNET SERVICES LTD.'S OPPOSITION TO
INTERNATIONAL PAYOUT SYSTEMS, INC.'S MOTION TO INTERVENE**

Pursuant to Rule 6.1(b) of the Local Rules for the Eastern District of New York, PacNet Services Ltd. ("PacNet"), by counsel, respectfully opposes International Payout Systems, Inc.'s motion to intervene (ECF Nos. 39 and 40) in this interpleader action.  As explained more fully below, the motion should be denied because (i) International Payout Systems, Inc. ("i-payout") has not alleged a significantly protectable interest in the interpleader funds described in PacNet's Complaint in Interpleader, and (ii) i-payout has not made a showing that it will be significantly prejudiced if its motion is denied.

**Background**

**A.  Origins of Interpleader Action and Background Regarding the PacNet Group**

Pursuant to 28 U.S.C. § 1335(a), PacNet brought this action in interpleader for a judicial resolution of competing claims that the defendants have, or may have, in funds that PacNet is holding on behalf of certain clients.  PacNet and its subsidiaries and affiliated companies (together

the "PacNet Group") are holding the funds pending formal dissolution of its business arising from the September 22, 2016 designation of the PacNet Group by defendant Office of Foreign Assets Controls of the United States Department of Treasury ("OFAC").

From its inception in 1994 to September 22, 2016, the PacNet Group operated a leading international payment processing business with headquarters in Vancouver, British Columbia. Compl. ¶ 23. The PacNet Group and its 125 employees offered more than 700 merchants and non-profit organizations around the world payment solutions involving credit card, electronic payment, direct debit, and check processing services. *Id.* ¶¶ 23, 28–29. The PacNet Group also offered multi-currency payout services such as refunds, rebates, and commission payments. *Id.* ¶ 23. PacNet's clients included well-respected national and international companies and organizations such as Bloomberg Business Week, MasterCard Payment Gateway Services Client Finance, the Catholic Archdiocese of Durban, Dementia Research UK, Animals Asia Foundation Limited, Special Olympics British Columbia Society, and iATS Payments LLC (through which PacNet processed payments for dozens of charities and community institutions). *Id.* ¶ 29.

PacNet was audited regularly and frequently by the Canadian government, financial institutions, and independent auditors and accountants. *Id.* ¶ 24. PacNet employed professional compliance staff and well-respected outside auditors. *Id.* The companies of the PacNet Group were registered with the appropriate regulators, including the Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC"), the U.S. Financial Crimes Enforcement Network ("FinCEN"), the U.K. Financial Conduct Authority ("FCA") and other governmental agencies. *Id.* ¶ 32.

**B. OFAC's Designation of the PacNet Group and Rescission of That Designation**

On September 22, 2016, without any notice whatsoever to the PacNet Group and without judicial process, OFAC designated the PacNet Group as a significant transnational criminal organization ("TCO"). *Id.* ¶ 3. OFAC placed the PacNet Group and twelve of its employees and officers on the Specially Designated Nationals and Blocked Persons List ("SDN List") based on a minority portion of PacNet's business, which pertained to payment processing for merchants that distributed direct-mail promotions involving sweepstakes reports or astrological information. *Id.* ¶¶ 3, 29. The immediate legal impact of the designation was twofold: (i) a block was placed on all property and interests in property of the PacNet Group and all designees subject to United States jurisdiction, and (ii) all "United States Persons" (as defined in Executive Order No. 13,581)[1] were prohibited from transacting business with the PacNet Group and all designees. The practical and immediate effect of the designation was that nearly all financial institutions, insurers, and other businesses worldwide froze or denied the PacNet Group access to bank accounts, insurance, and property necessary for conducting business. *Id.* ¶ 4. Thus, the PacNet Group was forced to cease operations and wind down its business, *id.* ¶ 5, but lacked the legal and practical ability to return funds that it was holding on behalf of certain clients. As outlined below, following PacNet's

---

[1] Section 3(c) of Executive Order No. 13,581 defines "U.S. Persons" to mean "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States." Exec. Order No. 13,581, *reprinted in* 76 Fed. Reg. 44,757 (July 24, 2011).

submission of detailed information about the true nature of its business, OFAC rescinded entirely those designations.

From February 2017 through August 2017, OFAC removed nine employees and officers from the SDN List. *Id.* ¶ 8. As of September 2017, the PacNet Group remained on the SDN List as did three individuals. On or about September 19, 2017, OFAC and PacNet finalized an agreement (the "September 19 Agreement") providing for the removal of the remaining PacNet entities and individuals on the condition that PacNet, as a disinterested stakeholder, place into an interpleader account funds owed by the PacNet Group to certain former clients identified by OFAC. *Id.* ¶ 10. Under the agreement, PacNet was required to—and did—provide OFAC with a list of outstanding debts and liabilities to all of PacNet's former clients, *id.* ¶ 55, which included $2.3 million in funds owed to i-payout.

In accordance with the parties' September 19 Agreement, OFAC examined the list (with the assistance of other agencies and departments of the U.S. Government including the U.S. Department of Justice), *id.*, and, on October 6, 2017, provided written notice that it had identified a reasonable factual basis to believe that certain of the listed debts and liabilities involved the proceeds of fraud or money laundering allegedly committed by a small percentage of PacNet's former clients. *Id.* ¶ 56. Based on this allegation, OFAC asserted a claim to the funds. OFAC made no such allegation or claim regarding the amounts owed to i-payout. PacNet had no role in the identification and selection of those debts or funds by OFAC on behalf of the United States.

**C. Filing of the Complaint-in-Interpleader by PacNet**

Pursuant to the September 19 Agreement, OFAC directed PacNet as a disinterested stakeholder to initiate an interpleader action to resolve the competing claims between OFAC and

PacNet's former clients with respect to the debts identified in OFAC's October 6 Notice. *Id.* ¶ 10. OFAC issued a license authorizing PacNet to transfer the combined total of $5,220,855.08 USD into the Court registry. *Id.* ¶¶ 56–57.

On October 16, 2017, PacNet filed its Complaint in Interpleader (ECF No. 1) as a disinterested stakeholder and an unopposed motion for leave to deposit $5,220,855.08 USD into the Court registry (ECF No. 2). On October 18, 2017, the Court granted PacNet's motion and authorized PacNet to transfer interpleader funds from "BMO Harris Bank, Union Bank, and/or any other necessary financial institution or account to the registry of the Court . . . ." Order Authorizing Deposit at 2, ECF No. 7. PacNet immediately acted to direct BMO Harris Bank and Union Bank to transfer funds in that total amount to the Court registry. To date, $2,671,335.59 has been wired to the Clerk of Court to be deposited into the Court registry from Union Bank pursuant to the Court's Order, but the Government still has not complied with the Court's October 18 Order and allowed the remaining $2.5 million from BMO Harris Bank and Avidia Bank to be transferred to the Court registry.[2]

On November 16, 2017, i-payout moved to intervene as of right and permissively pursuant to Federal Rule of Civil Procedure 24(a)(2) and 24(b). Mot. to Intervene, ECF No. 39. Neither i-payout's motion nor its memorandum in support alleges facts to support that OFAC or any other

---

[2] At the time of the September 19 Agreement and the filing of the October 16 interpleader complaint and motion to transfer funds from the BMO Harris Bank accounts of PacNet to the Court registry, OFAC and PacNet understood that a portion of the BMO Harris Bank funds had been seized by the United States. Unbeknownst to PacNet, the United States had seized the remaining funds from BMO Harris Bank and funds in an Avidia Bank account through *ex parte* actions in September 2016 and September 2017 (notwithstanding that, at the same time, the Government was negotiating the agreement that required the interpleader of the BMO Harris funds). PacNet repeatedly has requested the Government comply with the Court's October 18 order and September 19 Agreement and release the seized BMO Harris and Avidia Bank funds into the Court's registry. To date, the Government has refused to do so.

Defendant-in-Interpleader claims a right to i-payout's funds or that the Interpleader Fund is the only asset from which PacNet would be able to satisfy a judgment in i-payout's favor. i-payout contends that funds it is owed were held at Union Bank and TD Bank. i-payout Mem. at 3. PacNet acknowledges and does not dispute its indebtedness to i-payout.

**Legal Standard**

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides that an applicant must be allowed to intervene in an action when the applicant:

> claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2). In order to intervene as of right under Rule 24(a)(2), an applicant must (i) file timely, (2) demonstrate an interest in the action, (3) show any impairment of that interest arising from an unfavorable disposition, and (4) have an interest not adequately protected by an existing party. *John v. Sotheby's, Inc.*, 141 F.R.D. 29, 34 (S.D.N.Y. 1992) (unpublished) (citing *Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 96 (2d Cir. 1990)). With respect to the second criterion, the applicant's asserted interest must be "direct, substantial, and legally protectable." *XL Specialty Inc. Co. v. Lakian*, 632 Fed. App'x 667, 669 (2d Cir. 2015) (unpublished) (quoting *Wash. Elec. Coop., Inc.*, 922 F.2d at 97). A mere economic interest in the outcome of the litigation is insufficient to support the motion to intervene. *Westra Constr., Inc. v. United States Fid. & Guar. Co.*, 546 F. Supp. 2d 194, 201 (M.D. Pa. 2008). Indeed, the mere fact that a lawsuit may impede a third party's ability to recover in a separate suit ordinarily does not give a third party the right to intervene. *Id.* (quoting *Mountain Top Condo. Ass'n v. Dave Stabbert*

*Master Builder, Inc.*, 72 F.3d 361, 319 (3d Cir. 1995)) *see also Haw.–Pac. Venture Capital Corp. v. Rothbard*, 564 F.2d 1343, 1346 (9th Cir. 1977); *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 454 (5th Cir. 1984).

If an intervention application fails to meet all four criteria listed above, the application must be denied. *See United States v. Pitney Bowes*, 25 F.3d 66, 70 (2d Cir. 1994).

### Argument

i-payout's intervention application should be denied because i-payout has not made a showing sufficient to meet the second and third elements of the four-part test—that is, i-payout has not established a significantly protectable interest in the interpleader funds or that it will suffer unfair prejudice if its motion is denied.

i-payout argues that it has a "substantial financial interest" in the subject matter of this lawsuit because it claims an ownership interest in the Interpleader Fund. *See* i-payout Mem. at 7-8. But i-payout's purported ownership interest is not based on any claim to specific account balances that comprise the Interpleader Fund. i-payout seeks to intervene based solely on its general economic interest as "a client of PacNet" and ensuring that PacNet has enough assets to return account balances "held by PacNet in Union Bank and TD Bank". i-payout's Mem. at 8. It is well-settled that "'a mere economic interest in the outcome of the litigation is insufficient to support a motion to intervene." *Westra Constr., Inc.*, 546 F. Supp. 2d at 201 (quoting *Mountain Top Condo. Ass'n*, 72 F.3d at 366). Rule 24(a)(2) requires i-payout to establish a "significantly protectable" interest in "specific funds." *Id.* To meet this test, i-payout must show that it has a protectable interest in a discrete, segregated fund, such as a trust fund or escrow account. *See id.* at 201–02 (citing *Liberty Mut. Ins. Co. v. Treedale, Inc.*, 419 F.3d 216, 221 (3d Cir. 2005)); *see*

7

*also Mountain Top Condo. Ass'n*, 72 F.3d at 356. That is a showing i-payout did not and cannot make.

i-payout does not show a protectable interest in specific, segregated funds on deposit with PacNet's banks or the Court registry. As a disinterested stakeholder in the Interpleader Fund, PacNet has no interest in or claim to the funds at issue in this interpleader action which are owed to clients identified by OFAC in its October 6 Notice. At most, i-payout has shown that amounts in PacNet's general accounts with BMO Harris and Union Bank may be used to satisfy PacNet's debts and liabilities to i-payout. Where, as here, the funds in question have not been set aside but remain commingled with general assets, no "specific fund" exists, and the intervenor's interest in the Interpleader Fund is purely economic and not significantly protectable. *Id.* at 201 (citing *Liberty Mut. Ins. Co.*, 419 F.3d at 221). Because i-payout has not shown a property interest in a specific, segregated fund, i-payout has no "significantly protectable interest" in the assets deposited in the Court's registry as required under Rule 24(a)(2), and its motion should be denied.

i-payout's motion also fails because it does not satisfy the third criterion, which requires a showing that denial of i-payout's motion will impede or impair its ability to recover funds on deposit with PacNet. With respect to the third criterion, i-payout states that intervention is appropriate "for the purposes of evaluating whether its financial interest will be impaired if it is not permitted to intervene." i-payout Mem. at 9. i-payout states further that this Court's denial of the motion and award of funds to OFAC or other PacNet client "would cause i-payout to bring a separate proceeding to recover its funds." *Id.* But the fact that i-payout would have to initiate a separate action is not the kind of "prejudice" Rule 24(a)(2) requires. If it were, the requirement would be meaningless: every applicant who is denied leave to intervene must pursue recovery by

8

other means.  This interpleader action is not a bankruptcy proceeding in which all claimants submit their claims for orderly disposition.  PacNet is working to pay all of its customers in compliance with its contractual obligations and the law.  Unfortunately, due to OFAC's unwarranted designation of the PacNet Group, that process will take some time. i-payout's intervention motion is an effort to shortcut that process and interject itself into disputes concerning specific customers and the United States.

Rule 24(a)(2) requires every applicant to show that its ability to protect its interest will be impeded or impaired if intervention is denied.  *Pitney Bowes*, 25 F.3d at 70.  Put another way, the applicant must proffer some evidence that no other assets are available to satisfy a judgment in the applicant's favor.  *See* Order at 4, *In re 650 Fifth Avenue and Related Props.*, No. 1:08-cv-10934-KBF (S.D.N.Y. Mar. 12, 2015), ECF No. 1299 (citing *Republic of the Philippines v. Christie's*, No. 98 Civ. 3871 (RPP), 2000 WL 1056300, at *4 (S.D.N.Y. 2000)(unpublished)). i-payout has made no such showing in this case.  As a result, i-payout's motion should be denied.

In the alternative, i-payout contends that it should be permitted to intervene pursuant to the permissive intervention provision of Rule 24(b) "because i-payout shares a common question with the existing parties—whether it . . . has a claim to the funds at issue." i-payout Mem. at 10.  As noted above, this interpleader action is not a bankruptcy proceeding in which all claimants submit their claims for disposition.

As noted above, OFAC with the assistance of the U.S. Justice Department examined the list of contractual debts owed to clients by PacNet.  Based on that review by the United States, OFAC in October 2017 notified PacNet in writing that the review had identified a reasonable factual basis to believe that certain of the listed debts and liabilities involved the proceeds of

9

fraud or money laundering allegedly committed by a small percentage of PacNet's former clients. Based on that claim by the Government, PacNet filed this interpleader action as a disinterested stakeholder and the Government is to file its Answer on January 19 to assert its alleged claim to the funds. The United States has made no claim regarding the amounts owed by PacNet to i-payout. Thus, i-payout does not share with this interpleader "action a common question of law or fact." Fed.R.Civ.P. 24(b)(1)(B). Accordingly, permissive intervention under Rule 24(b) is unwarranted under the circumstances.

## Conclusion

i-payout has not established a significantly protectable interest in the Interpleader Fund or that it will be unfairly prejudiced if denied leave to intervene. Accordingly, i-payout has not established a right to intervention under Rule 24(a)(2) or a basis for permissive intervention under Rule 24(b), and its motion should be denied.

Dated: January 2, 2018

/s/ Jeff Ifrah
A. Jeff Ifrah
E-mail: jeff@ifrahlaw.com
George R. Calhoun
E-mail: george@ifrahlaw.com
IFRAH LAW
1717 Pennsylvania Ave., NW, Suite 650,
Washington, D.C. 20006
Telephone: (202) 524-4142

Steven W. Pelak
E-mail: SWPelak@hollandhart.com
Michael J. O'Leary
E-mail: MJOleary@hollandhart.com
HOLLAND & HART LLP
975 F Street NW, Suite 900
Washington, D.C. 20004
ATTORNEYS FOR PLAINTIFF-IN-INTERPLEADER

## CERTIFICATE OF SERVICE

I certify that on January 2, 2018, I served a copy of the foregoing document to the following by one or more of the following methods:

☒ ECF

☒ U.S. Mail, postage prepaid

☐ Hand Delivery

☐ Fax

United States Attorney's Office for the Eastern District of New York
Assistant U.S. Attorneys Rukhsanah Singh and Tanisha R. Payne
271 Cadman Plaza East
Brooklyn, NY 11201

United States Department of the Treasury
Office of Foreign Asset Control, Attn. Andrew Winerman
Treasury Annex
1500 Pennsylvania Avenue, NW
Washington, DC 20220

Gibson, Dunn & Crutcher LLP
Gabrielle Levin
200 Park Avenue
New York, NY 10166

John Does 1-73 (by ECF)

*/s/ A. Jeff Ifrah*
A. Jeff Ifrah