# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PACNET SERVICES, LTD.,<br><br>    **Plaintiff-in-Interpleader.**<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL; JOHN DOE DEFENDANTS 1 –73,<br><br>    **Defendants/Claimants-in-Interpleader.** | 17-cv-6027 (JMA) (LB)<br><br>Judge Joan A. Azrack |

## PLAINTIFF'S SUPPLEMENTAL RESPONSE TO COURT'S MAY 31, 2020 ORDER

Plaintiff-in-Interpleader PacNet Services, Ltd. ("PacNet Services") respectfully submits this supplemental response to the questions set forth in the Court's May 31, 2020 Order (Dkt. 168) ("Order"). A recent criminal prosecution brought by the Government and assigned to this Court provides further support for the factual and legal arguments presented in PacNet Services' July 1, 2020 submission to the Court.

### Discussion

On August 31, 2020, an indictment against Gary Denkberg and Sean Novis was unsealed and assigned to this Court.[1] The indictment highlights several key factual circumstances and legal points which provide additional support for PacNet Services' July 1, 2020 submission to the Court.

**1. PacNet has been found properly to be an appropriate Interpleader-Plaintiff.**

Several of the Court's May 31, 2020 questions aimed at whether PacNet Services had "clean hands" such that it was previously properly found by the Court and U.S. Government to

---

[1] *United States v. Sean Novis and Gary Denkberg*, No. 20-cr-00335-JMA (Dkt. 6). On August 31, the case was reassigned to this Court. (*Id.*, Dkt. 4.)

1

constitute a disinterested stakeholder and thus an appropriate interpleader-plaintiff in this matter. The indictment against Mr. Denkberg and Mr. Novis serves to highlight that PacNet Services has indeed been appropriately found to be an interpleader-plaintiff. As illustrated by its handling of financial transactions for the business of Mr. Denkberg and Mr. Novis, PacNet Services operated a transparent and good faith anti-money laundering compliance program and informed Canadian and U.S. law enforcement agencies of suspicious conduct by customers.

PacNet Services operated for more than 20 years as a registered, regulated, and audited money services business (MSB) in Vancouver, Canada. As such, PacNet Services submitted Suspicious Transaction Reports (STRs) and Large Cash Transaction Reports (LCTRs) to Canada's Financial Transactions and Reports Analysis Center (FINTRAC). FINTRAC serves Canadian law enforcement agencies in their efforts to identify money laundering and related offenses. In addition to furnishing STRs and LCTRs to FINTRAC, PacNet Services submitted Suspicious Activity Reports (SARs) and Currency Transaction Reports (CTRs) to the Financial Crimes Enforcement Network (FinCEN) of the U.S. Treasury Department. FinCEN is the U.S. version of FINTRAC and works closely and daily with FINTRAC to share information and resources in their mutual anti-money laundering (AML) efforts.

The indictment by the Government against Mr. Denkberg and Mr. Novis alleges that in 2012 they disregarded a pledge to discontinue alleged fraudulent business practices. In 2012, 2013, 2014, and 2015, PacNet Services informed FINTRAC and FinCEN of suspicious financial transactions and large cash transactions by the business of Mr. Denkberg and Mr. Novis.

**2. PacNet Services operated a good faith AML compliance program and informed Canadian and U.S. law enforcement of suspicious financial transactions more than five years before the indictment of Mr. Denkberg and Mr. Novis.**

Attached to this submission are several exhibits which provide copies of STRs and LCTRs submitted in 2015, 2014, 2013, and 2012 by PacNet Services to FINTRAC, in addition to a SAR submitted to FinCEN, regarding transactions by the business of Mr. Denkberg and Mr. Novis. They plainly demonstrate PacNet Services' transparency and contemporaneous disclosure of information and cooperation with law enforcement.

For instance, as reflected in Exhibit 1 (STR 307375984), PacNet Services in June 2015 filed an STR in which it identified to Canadian law enforcement through FINTRAC a suspicious financial transaction dated June 19, 2015 involving Mr. Denkberg's business. In that report, PacNet Services reported that $11,985 in Euros had been received from Mr. Denkberg's business in an "unmarked envelope with no indication of completion of CBSA E667 (Cross-Border Currency or Monetary Instruments Report General) form for large cross-border cash shipment" of currency into Canada. Exh. 1 at 3. PacNet Services further reported that the cash funds were believed to be the result of the promotion by Mr. Denkberg's business of "sweepstakes reports mailed to European countries and the US." Exh. 1 at 3.

Consistent with its ongoing cooperation with Canadian law enforcement, PacNet Services informed the Canadian Government of the suspicious nature of activity: "This activity is a red flag for the existence of sweepstakes fraud as per FINTRAC publication Mass Marketing Fraud: Money Laundering Methods and Techniques, published January 2015." Exh. 1 at 3. PacNet Services also noted that it "advised [Mr. Denkberg's business] to complete CBSA E667 (Cross-Border Currency or Monetary Instruments Report - General) form for large cross-border cash shipments" as required under Canadian law. Exh. 1 at 4. Finally, the June 2015 STR by PacNet

Services presented detailed identifying information about Mr. Denkberg and his business, including location, telephone numbers, date of birth, driver's license number, and New York state incorporation number for the business.

By way of further example of PacNet Services informing Canadian law enforcement of a suspicious financial transaction by Mr. Denkberg's business, Exhibit 2 is STR No. 294299297 submitted in November 2014 by PacNet Services. In this STR, PacNet Services reported contemporaneously to FINTRAC a suspicious financial transaction on November 21, 2014 involving $12,000 in Euros conducted on behalf of Mr. Denkberg's business. PacNet Services advised FINTRAC that "cash came in unmarked envelope with no indication of completion of CBSA E667 (Cross-Border Currency or Monetary Instruments Report General) form for large cross-border cash shipment" into Canada and that it had been received from a named female in New York on behalf of Mr. Denkberg's business. PacNet Services reported detailed identifying personal and business information about Mr. Denkberg and his business. Exh. 2 at 1-3. Finally, PacNet Services notified FINTRAC that it had advised Mr. Denkberg's business of its responsibility to file an E667 form with the Canada Border Services Agency when undertaking such a cash shipment to Canada. Exh. 2 at 3.

Finally, Exhibits 3, 4, 5, and 6 are examples of LCTRs filed by PacNet Services concerning large cash transactions by the business of Mr. Denkberg and Mr. Novis. Exhibit 3 is LCTR No. 252082668 and concerns a cash transaction involving $12,000 by Mr. Denkberg which was reported in December 2012 by PacNet Services to FINTRAC. PacNet Services provided detailed personal and business information regarding Mr. Denkberg and his business, including addresses, phone numbers, driver's license number, and corporate information. Exh. 3 at 1-3. Likewise, Exhibits 4, 5, and 6 are LCTRs No. 265325519, No. 281118806, and No. 243494556 concern cash

4

transactions involving Euros by Mr. Denkberg and Mr. Novis which were submitted by PacNet Services to FINTRAC in July 2013, April 2014, and June 2014.[2] The LCTRs submitted in 2012, 2013, and 2014 likewise provided Canadian law enforcement with detailed personal and business information regarding Mr. Denkberg, Mr. Novis, and their direct mail business.

In addition, PacNet Services made similar disclosure to U.S. law enforcement as well. Specifically, PacNet Services filed SARs and CTRs with FinCEN of the U.S. Treasury Department. For example, Exhibit 7 is a copy of a SAR submitted by PacNet Services to FinCEN in September 2015 regarding Multi-National Direct Marketing Services Inc. and Mr. Denkberg. The SAR reported a cash delivery of foreign currency totaling $17,396 sent in August 2015 by Mr. Denkberg through FedEx delivery. PacNet Services included detailed information regarding the business and Mr. Denkberg, including his social security number, date of birth, driver's license number, telephone number, email address, and address. PacNet Services also informed U.S. law enforcement of its suspicions about the transaction in extraordinary detail as follows:

> We think that this activity is suspicious for the following reasons:
> 1. Misleading purpose and intended nature of the business relationship.
> When the business relationship with this client was set up we were advised they were a Management /Consulting Firm. A large cash transaction was inconsistent with the expected activity of this type of business. Our front officer first confirmed that Multi-

---

[2] Exhibit 6 (LCTR No. 243494556) was submitted in 2012 and then updated in June 2014. This is confirmed by the LCTR number itself, which FINTRAC assigns sequentially, as the number indicates that the original LCTR was filed in or before December 2012 (compare to the LCTR number in Exhibit 3, which bears a subsequent FINTRAC number 252082668 and was submitted in December 2012). As part of their regular audit and review efforts, personnel of FINTRAC and the Canadian Border Services Agency (CBSA) separately visited the offices of PacNet Services and inspected and reviewed PacNet Services' filing and recordkeeping of STRs and LCTRs and compliance with other Canadian anti-money laundering laws and regulations. In the course of such regular audits and reviews, personnel of FINTRAC and CBSA reviewed, commented upon, and recommended improvements in the completion of STRs, LCTRs, and other reports. As a result, PacNet would then update relevant reports to provide information in the form requested by the Canadian law enforcement officers, such as the LCTR at Exhibit 6 which was updated in June 2014. Audits and reviews by FINTRAC, CBSA, and highly respected independent auditors and AML compliance companies such as Deloitte were regular occurrences for PacNet Services as a highly regulated and licensed MSB. For example, in 2014, FINTRAC, CBSA, and Deloitte each separately reviewed and audited PacNet Services records, reports, and AML compliance program. For further description of PacNet Services' transparency and those outside reviews and audits, please see by way of brief example the descriptions in the Interpleader Complaint at ¶ 33 which was filed in this action in October 2017 (Dkt. 1) and PacNet Services' Response to the Court's May 31, 2020 Order at 20-22 (Dkt. 170).

> National Direct Marketing Services Inc. was a consultant in the Direct Mail industry and not selling any products. When direct asked about the origin of the cash funds, the client admitted that these were derived from promotions the client processed with other accounts hold with us. Shortly afterwards the client asked to close their GBP and CAD accounts and keep their US and EUR accounts as holding accounts.
> 2. Unusual High cash percentage
> According to our records, cash deposits accounted for 100% of all their incoming funds during the last 12 months. This is unusual high for this type of business. According to internal experts of this industry, the expected percentage of cash for direct mailers is much lower and usually in the 1-5 % - range.
> 3. Mass Marketing Fraud
> We believe that the clients promotions are sweepstakes reports mailed to European countries and the US, and these cash deposits are the proceeds." Exh. 7 at Part V ("Suspicious Activity Information – Narrative").

Simply put, PacNet Services did not attempt to conceal suspicious activity by Mr. Denkberg or Mr. Novis. To the contrary and more than five years before the recently unsealed indictment, PacNet Services affirmatively, regularly, and contemporaneously informed Canadian and U.S. law enforcement of the direct mail activities by the business of Mr. Denkberg and Mr. Novis.

There can be no wrongful intent and no conspiracy as a matter of law when PacNet Services and its principal officers took active steps to disclose and describe the identities and suspicious activities of Mr. Denkberg and Mr. Novis to Canadian and U.S. law enforcement authorities more than five years before the Government indicted Mr. Denkberg and Mr. Novis. As explained by the Supreme Court in *Ocasio v. U.S.*, 578 U.S. ___, 136 S. Ct. 1423, 1429 (2016), "under established case law, the fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" (quoting *Salinas v. U.S.*, 522 U.S. 52, 65 (1997)). Far from being engaged in a "joint commitment" with Mr. Denkberg and Mr. Novis to carry out an unlawful scheme, PacNet Services affirmatively and contemporaneously disclosed and described honestly and in writing those individuals' identities and activities to law enforcement authorities.

PacNet Services' actions with respect to Mr. Denkberg and Mr. Novis provide further evidence to answer the Court's question whether PacNet Services had sufficiently clean hands to invoke interpleader. In short, Judge Garaufis' October 18, 2017 Order based on the record and the Government's determination and agreement that PacNet Services constitutes an appropriate interpleader plaintiff were strongly supported by the facts. The Government's September 2017 Agreement was not entered into without careful consideration. Multiple lawyers from the Treasury Department and Justice Department reviewed and approved that Agreement, after extensive negotiations and consideration by multiple government officials.

Far from attempting to conceal its clients' activities from the Government and law enforcement, PacNet Services affirmatively and contemporaneously disclosed cash and suspicious financial transactions of its direct mail clients to Canadian and American law enforcement authorities. It is well established that a conspiracy to defraud requires a conspiratorial agreement involving "a heightened mental state"[3] where the parties "must agree to pursue the same criminal objective"[4] and hold "a joint commitment"[5] to the underlying substantive criminal offense. One can hardly think of more exculpatory and dispositive evidence than objective proof that the party contemporaneously informed law enforcement agencies of the activities of the other party. In fact, federal courts are uniform in holding that a party informing law enforcement contemporaneously upon the potential criminal activities of another person cannot and does not amount to a co-conspirator.[6]

Such approach follows the result in *United States v. Vanderzee,* a prosecution of two local bankers for conspiracy to launder the funds of a drug dealer. The District Court in *Vanderzee*

---

[3] *Bailey v. United States*, 444 U.S. 394, 405 (1980).
[4] *Salinas*, 522 U.S. at 63.
[5] *Ocasio*, 136 S.Ct. at 1429.
[6] *United States v. Leal*, 921 F.3d 951, 959 (10th Cir. 2019).

granted a motion for judgment of acquittal at the close of the Government's trial proof where the two bankers who were charged with conspiracy to commit money laundering had filed SARs or CTRs. The District Court in *Vanderzee* explained its dismissal of the prosecution by observing simply that the two bank officials "reported the money, it was done on a form, they weren't trying to conceal it from the Government or anybody else."[7] Under such circumstances, there can be no conspiratorial agreement, common scheme, or intent to defraud.

Such legal precedent and the above-described factual circumstances in relation to Mr. Denkberg and Mr. Novis' business underscore that Judge Garaufis' October 18, 2017 Order and findings in this case and the Government's prior determination and agreement that PacNet is an appropriate interpleader plaintiff were and remain strongly supported by the facts and should not be revisited.[8] For the reasons set forth herein and in PacNet Services' initial response to the Court's Order (Dkt. 170), the Court should not stay these proceedings, and the pending motions should be resolved as requested previously by PacNet Services.

3. **PacNet Services followed U.S. Government guidance and industry practice and cooperated regularly and transparently with Canadian and U.S. law enforcement offices.**

The U.S. Government, speaking through FinCEN and other law enforcement agencies, has concluded and publicly stated that financial institutions, which by statutory and regulatory definition include MSBs, greatly assist the Government's investigations of fraud, money laundering, and other offenses by submitting SARs. Most recently and most relevant, FinCEN in December 2019 issued a public statement regarding its analytical findings under this headline:

---

[7] *See* PacNet Services' Exhibit G to its July 1, 2020 Submission, which is the February 27, 1992 Trial Transcript at 4 in *United States v. Salina-Tevino, Pounds Jr. and Vanderzee*, No. SA-91-CR-412 (W.D. Tex.).
[8] *See William Penn Life Ins. Co. of New York v. Viscuso*, 569 F.Supp.2d 355, 363 (S.D.N.Y. 2008) (holding that an interpleader plaintiff need not be without flaw and that "negligence on the part of the stakeholder does not bar interpleader, even if the controversy has resulted quite directly and foreseeably from that negligence").

"FinCEN Analysis: Bank Secrecy Act Reports filed by Financial Institutions Help Protect Elders from Fraud and Theft of Their Assets." FinCEN Public Release (Dec. 4, 2019), *available at* https://www.fincen.gov/news/news-releases/fincen-analysis-bank-secrecy-act-reports-filed-financial-institutions-help (reporting that "[m]any SARs filed by MSBs indicated elders fell victim to scams in which they sent money overseas.") (last visited Nov. 2, 2020). Contrary to joining alleged wrongdoing or fraudulent schemes,[9] PacNet Services as illustrated above disclosed to Canadian and U.S. law enforcement agencies suspicious activity in relation to the Denkberg financial transactions. In fact, such disclosures occurred in excess of five years before the recently unsealed indictment.

PacNet Services' disclosures in relation to the Denkberg financial transactions are hardly unique or distinct from the repeated cooperation and disclosure with law enforcement by the company and its personnel. As set forth in our July 1, 2020 response to the Court's questions and in multiple motions and briefs filed in this matter, PacNet Services had a good faith AML compliance program which (a) followed industry standards; (b) submitted STRs, LCTRs, and Electronic Funds Transfer Reports (EFTRs) regarding its direct mail customers with Canadian law enforcement agencies; (c) was regularly reviewed and audited by the FINTRAC, national banks, compliance personnel of major U.S. finance and consulting companies, and outside independent accountants; (d) made its customer lists and its records readily available to national banks handling its accounts and transactions; (e) used the internationally respected Brinks International to transport monetary funds transparently and in accord with domestic and foreign laws; and (f)

---

[9] None of this discussion is intended to express any conclusion regarding the conduct of Mr. Denkberg and Mr. Novis. Financial institutions submit to the Canadian and U.S. governments STRs and SARs concerning financial transactions which may appear "suspicious" according certain indicators highlighted in FINTRAC and FinCEN publications but which following subsequent representations, review, or investigation may be entirely lawful.

regularly assisted Canadian and U.S. law enforcement agencies by providing information, testimony, and documentation about direct mail customers.

For instance, in 2013, the U.S. Federal Trade Commission (FTC) and Justice Department relied upon and vouched for the testimony of PacNet Services President Rosanne Day to describe the payment processing industry, PacNet Services' operations and processes, and particular practices and transactions involving one specific direct mail customer. In a civil action brought by the FTC in Nevada, *FTC v. Dayton Family Productions, Inc., et al.*, No. 2:97-cv-00750-GMN-VCF (Dkt. 179-10), the U.S. Government relied upon a detailed declaration by Ms. Day to support its motion for summary judgment.[10] In her declaration for the *Dayton Family Productions* matter, Ms. Day described transparently and completely the operations and processes of PacNet Services as well as transactions conducted by PacNet Services on behalf of the direct mail customer. Rather than suggest that PacNet Services had acted wrongfully or contrary to law, the U.S. Government lawyers prosecuting the case were complimentary of the cooperation by PacNet Services and Ms. Day and made clear that the Government would much appreciate continued cooperation and disclosure of similar information in the future. PacNet Services continued to do just that, as demonstrated by the STRs, LCTRs, SARs and other reports submitted in relation to the financial transactions by Mr. Denkberg and other direct mail customers.

In reviewing this matter, we respectfully suggest that the Court ask whether the above listed factual circumstances and many additional circumstances demonstrating PacNet Services' transparency and cooperation with law enforcement were disclosed in the declarations filed *ex parte* and under seal by the Government to seize the Interpleader Fund and PacNet Services' bank accounts which were subject to Judge Garaufis' October 18, 2017 Order. To date, such

---

[10] For ease of reference, the declaration is attached as Exhibit 8 to this submission.

declarations remain sealed and unavailable to PacNet Services. If disclosed, we anticipate that the Government's submissions would be found to contain material misstatements and omissions.

The conduct in which PacNet Services engaged in relation to the business of Mr. Denkberg and Mr. Novis is the precise conduct suggested by the December 2019 FinCEN public report noted above about combatting elder fraud through the filing of SARs by financial institutions such as PacNet and other MSBs. In addition, recent media reports verify and corroborate that other financial institutions likewise receive, understand, and follow the same direction from the Government. *See, e.g.*, New York Times, "Banks Suspected Illegal Activity, but Processed Big Transactions Anyway," (September 20, 2020), *available at* https://www.nytimes.com/2020/09/20/business/fincen-banks-suspicious-activity-reports-buzzfeed.html (last visited Nov. 2, 2020); Reuters, "Money-laundering fight starts with transparency," (September 21, 2020) (noting that "[r]ather than blocking potential criminal transfers, banks are supposed to file SARs with regulators"), *available at* https://www.reuters.com/article/us-global-banking-fincen-breakingviews/breakingviews-money-laundering-fight-starts-with-transparency-idUSKCN26C1MV (last visited Nov. 2, 2020). Regardless of the wisdom behind this governmental policy, financial institutions that follow it act lawfully by informing the Government through the filing of SARs, LCTRs, and the like, and, resultingly, are not joining a scheme or conspiracy to defraud.

**Conclusion**

PacNet Services respectfully submits that the Court should continue in place Judge Garaufis' October 18, 2017 Order, which found, based on the record and the September 2017 Agreement and October 2017 OFAC license by the United States, that PacNet Services constituted an appropriate interpleader plaintiff in this matter. PacNet Services further respectfully submits

that the Court should direct the United States to transfer without further delay the subject funds to the Interpleader Fund for final resolution of this interpleader action. Considering the Government's abuse of process beginning with the unlawful September 2016 designations and continuing until today in its refusal to honor its September 2017 Agreement with PacNet Services, any stay or further delay would amount to a denial of due process.[11]

For the integrity of the judicial process and rule of law, the "Government should honor its obligations."[12] But, where the Government refuses to do so, the judiciary should compel it to honor its settlement agreements:

> "The policy of favoring settlement agreements as a means of avoiding costly and time consuming litigation would scarcely be furthered by leaving a party without recourse when the other party fails to perform according to the terms of the agreement. It is well established, therefore, that a trial court retains an inherent power to supervise and enforce settlement agreements entered into by parties to an action pending before the court."[13]

We respectfully submit that the Court should (1) deny the Government's motion to dismiss the interpleader complaint; (2) grant PacNet's motion to compel the U.S. Government to comply with the Court's Interpleader Deposit Order and grant the relief sought in that motion; and (3) grant PacNet's and Intervenor International Payout's motions to show cause at which the United States would be called to demonstrate why sanctions, fees, and costs should not be imposed upon the United States officials responsible for this abuse of the Government's authorities.

---

[11] *United States v. Crozier*, 777 F.2d 1376 (9th Cir. 1985) (finding that a five-year pretrial restraining order against property violated due process).
[12] *Maine Community Health Options v. United States*, 590 U.S. ___, 140 S.Ct. 1308, 1331 (2020).
[13] *Dankese v. Defense Logistics Agency (U.S. Department of Defense)*, 693 F.2d 13, 16 (1st Cir. 1982) (citations omitted).

Dated: November 4, 2020                    /s/ A. Jeff Ifrah
                                           A. Jeff Ifrah
                                           jeff@ifrahlaw.com
                                           George R. Calhoun (*pro hac vice*)
                                           George@ifrahlaw.com
                                           IFRAH LAW
                                           1717 Pennsylvania Ave., NW, Suite 650
                                           Washington, D.C. 20006
                                           Telephone: (202) 524-4142

**CERTIFICATE OF SERVICE**

      I certify that this document, filed through the ECF system, will be sent electronically to all counsel of record.

                                      *A. Jeff Ifrah*
                                      A. Jeff Ifrah